**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **CONGRUENT MEDIA RESOURCING LLC,**<br><br>Plaintiff,<br>v.<br><br>**FORTINET, INC.,**<br><br>Defendant. | C.A. No. 2:26-cv-00952<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Congruent Media Resourcing LLC files this Original Complaint for Patent Infringement against Fortinet, Inc. and would respectfully show the Court as follows:

## I. THE PARTIES

1. Plaintiff Congruent Media Resourcing LLC ("Plaintiff") is a Texas limited liability company with a principal place of business located at 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

2. On information and belief, Defendant Fortinet, Inc. ("Defendant"), is a corporation organized and existing under the laws of Delaware with a place of business at 6735 Salt Cedar Way, Frisco, Texas 75034. Defendant's registered agent is Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## II. JURISDICTION AND VENUE

3. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4. On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its business in this forum, including at least a portion of the infringements alleged herein. Furthermore, Defendant is subject to this Court's specific and general personal jurisdiction because Defendant maintains a place of business at 6735 Salt Cedar Way, Frisco, Texas 75034.

5. Without limitation, on information and belief, within this state and this District, Defendant has used the patented inventions thereby committing, and continuing to commit, acts of patent infringement alleged herein. In addition, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas and this District. Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from services provided to persons or entities in Texas and this District. Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its providing services within Texas and this District. Defendant has committed such purposeful acts and/or transactions in Texas and this District such that it reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

6. Venue is proper in this District under 28 U.S.C. § 1400(b). On information and belief, Defendant maintains a place of business at 6735 Salt Cedar Way, Frisco, Texas 75034. On information and belief, from and within this District Defendant has committed at least a portion of the infringements at issue in this case.

7. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

## III. UNITED STATES PATENT NO. 9,135,418

8. Plaintiff incorporates the above paragraphs herein by reference.

9. On September 15, 2015, United States Patent No. 9,135,418 ("the '418 Patent") was duly and legally issued by the United States Patent and Trademark Office. The '418 Patent is titled "System and Method for Creating Secure Applications." A true and correct copy of the '418 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10. Congruent Media Resourcing LLC is the assignee of all right, title, and interest in the '418 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '418 Patent. Accordingly, Congruent Media Resourcing LLC possesses the exclusive right and standing to prosecute the present action for infringement of the '418 Patent by Defendant.

11. The invention in the '418 Patent relates to systems and methods for creating secure workspaces and applications, including the management and enhancement of same. (Ex. 1 at 1:16-19). The goal of the '418 Patent is to reduce security breaches by creating secure workspaces and applications. (*Id.* at 1:16-38). To do this, the '418 Patent discloses imposing functions, such as intercepts, that convert an unsecured target application to a secure application. (*Id.* at 1:54-57). These functions may be considered as an actual replacement of existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow. (*Id.* at 1:66-2:3). By adding these functions, the behavior of the secure application can be different from the original behavior of the target application. (*Id.* at 1:57-61). The '418 Patent explains that when these functions are added to the targeted application, the now secure application can be repackaged with the additional functions integrated with the original file. (*Id.* at 2:4-6).

12. The '418 Patent provides details regarding how application securitization occurs. Specifically, it discloses that one way application wrapping may occur is via an automated process in which no source code is modified, thereby reducing programmer oversight and errors. (*Id.* at

12:19-26). Additionally, the ‘418 Patent provides examples of this, including 1) replacing references to system services with references to a library that applies the necessary mechanisms and policies and 2) inserting secure references into the code of an application to replace non-secure references. (*Id.* at 12:24-35). Specifically, this securitization process may include interposing system API calls to allow a secure framework to intercept and control application functions. (*Id.* at 21:43-49). This process may further include encryption for additional protection of applications. (*Id.* at 21:49-58). One major benefit may be that management layers may be injected onto the compiled applications, removing the need for source code or developer-implemented application changes. (*Id.* at 12:36-47).

13. The ‘418 Patent also discloses technical examples of the use of securing applications via an intercept. One example method is called byte code injection, which replaces byte code API calls with intercepts. (*Id.* at 22:45-51). This is particularly useful for applications formatted for the Android operating system. (*Id.*; *see also* Figure 11; 23:45-60). Another disclosed technical method is to link replacement calls for native object code. (*Id.* at 22:51-57). This method is useful for applications that use native code and do not run under a virtual machine. (*Id.*). An example of this type of injection is link injection, which replaces preexisting system calls or the inclusion of new instructions in an immutable entity. (*Id.* at 24:64-25:24). The ‘418 Patent further discloses that linking order may be statically or dynamically linked, and that priority can be established during runtime. (*Id.* at 25:6-17). Finally, a system of obfuscation may prevent further modification or reversal of the securitization process. (*Id.* at 25:15-17).

14. The ‘418 Patent further discusses the technical benefits of repackaging the target application during a reconstruction phase. (*Id.* at 24:3-21). This is performed by a repackager. (*Id.* at 24:3-7). The repackager may be made of software or hardware elements and may be further

modified by secure object references injected before. (*Id.* at 24:7-9). In addition, this reconstructed and modified application may need a new certificate to be trusted. (*Id.* at 24:11-16).

**Asserted Claims**

15. Claim 1 of the '418 Patent claims:

> A method of operating a secure application, comprising:
>
> receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior:
>
> in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior; and
>
> via a processing unit, performing the second application behavior.

16. Claim 5 of the '418 Patent claims:

> The method according to claim 1, wherein the secure application is encapsulated to prevent data sharing with a non-secure application.

**IV. COUNT I**
**(PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 9,135,418)**

17. On information and belief, Defendant has directly infringed claims 1 and 5 of the '418 Patent in Texas, in this District, and elsewhere in the United States, by using and performing the claimed method with Fortinet FortiAIGate ("Accused Instrumentality").

18. **Direct Infringement**. As explained below, Fortinet FortiAIGate comprises a method of operating a secure application. Fortinet FortiAIGate combines application delivery with AI runtime security in order to provide application security. Fortinet describes how its guardrails aim to provide benefits such as preventing model manipulations, prompt injections, excessive consumption, and data leakage. Fortinet FortiAIGate provides security enforcement. Fortinet lists

several security concerns that FortiAIGate is designed to address. These include model poisoning, unauthorized access, malicious prompts, and data leakage.

OVERVIEW

operating a secure application

## Optimize and secure AI workloads and LLMs

For enterprises building proprietary generativeAI-powered applications, FortiAIGate combines application delivery with AI runtime security capabilities, FortiAIGate is designed to protect large language models (LLMs) from security risks. Deployed between the app and the model, it manages traffic flows and applies guardrails on the model input and output, preventing model manipulations, prompt injections, excessive consumption, and data leakage.

(*E.g.*, https://www.fortinet.com/products/fortiaigate).

Home > FortiAIGate 8.0.1 > FortiAIGate Administration Guide

8.0.1

operating a secure application

## Introduction

FortiAIGate serves as the central gateway between your AI applications and major large language model (LLM) providers such as OpenAI, Anthropic, and AWS Bedrock. Positioned at the core of your AI infrastructure, it enables organizations to deliver AI services efficiently while maintaining strict security controls over all LLM interactions.

FortiAIGate provides two primary capabilities:

- AI Flow handles intelligent AI application delivery, routing requests based on content and ensuring that traffic is processed securely and efficiently.
- AI Guard delivers comprehensive security aligned with the Open Worldwide Application Security Project (OWASP) LLM/MCP/ASI Top 10, offering protections such as prompt injection detection, data leak prevention, toxicity detection, and support for customizable security rules tailored to specific needs.

FortiAIGate includes a fully featured graphical interface that simplifies configuration and management. Administrators can easily set up AI Flow routing policies, define AI Guard security rules, and monitor real-time system activity. Detailed traffic logs and a visual dashboard provide full visibility into all AI-related requests passing through the system.

Built for modern environments, FortiAIGate runs as a containerized solution on Kubernetes, allowing the seamless deployment across public clouds, private clouds, or on-premise clusters. Its cloud-native architecture ensures scalability, portability, and operational consistency across diverse infrastructures.

(*E.g.*, https://docs.fortinet.com/document/fortiaigate/8.0.1/fortiaigate-administration-guide/784383/introduction).

## Common Threats to Learning Models

As enterprises integrate LLMs into core workflows, the attack surface expands in new and unexpected ways.

**FortiAIGate is designed to defend against the following:**

- **Prompt injections:** Malicious or manipulative inputs that insert code, remote commands, or instructions, forcing the model to perform unintended actions
- **Jailbreaking:** Attempts to override a model's built-in safety mechanisms, convincing it to generate prohibited content or execute unsafe tasks
- **Model poisoning:** Tampering with training data or algorithms to degrade performance or insert hidden biases
- **Data exfiltration:** Exploiting conversation context or model recall to extract confidential information such as proprietary code, PII, or intellectual property
- **Excessive consumption:** Attacks that drive up compute workloads through wasteful or complex queries, inflating GPU usage and operational costs

These attacks are difficult to detect with conventional tools because they occur through natural-language interactions that legacy solutions cannot interpret, rather than code execution. FortiAIGate applies AI-aware inspection, context validation, and real-time enforcement to detect and stop these threats as they occur, preserving both performance and governance integrity.

operating a secure application

(*E.g.*, https://www.fortinet.com/blog/security-operations/fortiaigate-optimizing-and-protecting-ai-workloads).




(*E.g.*, https://www.fortinet.com/products/fortiaigate).

19. Fortinet FortiAIGate practices the step of receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior. As background, Fortinet explains how applications were traditionally protected using firewalls. Web-based applications were protected with web application firewalls (WAFs). However, now that large language models and generative AI are integrated into applications, chatbots, and internal tools, traditional web application firewalls are not designed to inspect and secure these systems. Fortinet FortiAIGate takes a target application (for example, a Large Language Model ("LLM") app) and creates a secure application. On information and belief, FortiAIGate does this in part by modifying inputs and providing sanitized outputs to and from the LLM app and LLM model.




(*E.g.*, https://www.fortinet.com/products/fortiaigate).




(*E.g.*, https://www.fortinet.com/products/fortiaigate).

20. Fortinet FortiAIGate practices the step of, in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior. FortiAIGate may both secure and scale dynamic AI workloads. One way a target application is made secure is by applying both input and output guardrails to and from an LLM model. FortiAIGate's goal is to therefore achieve end-to-end runtime security. Internally, Fortinet FortiAIGate's AI Flow component handles intelligent AI application delivery by routing requests based on content. AI Guard is the core security component within FortiAIGate.




(*E.g.*, https://www.fortinet.com/products/fortiaigate).




(*E.g.*, https://docs.fortinet.com/document/fortiaigate/8.0.1/fortiaigate-administration-guide/396120/ai-flow).




(*E.g.*, https://docs.fortinet.com/document/fortiaigate/8.0.1/fortiaigate-administration-guide/592867/ai-guard).

21. Fortinet FortiAIGate performs the step of, via a processing unit, performing the second application behavior. As a result of either security issues or user-defined policies, FortiAIGate will then override the first application behavior using a processing unit.




(*E.g.*, https://www.fortinet.com/corporate/about-us/newsroom/press-releases/2026/fortinet-deepens-integration-to-uniquely-secure-enterprise-ai-at-scale-with-nvidia).

Home > FortiAIGate 8.0.1 > FortiAIGate Administration Guide

8.0.1

## Introduction

FortiAIGate serves as the central gateway between your AI applications and major large language model (LLM) providers such as OpenAI, Anthropic, and AWS Bedrock. Positioned at the core of your AI infrastructure, it enables organizations to deliver AI services efficiently while maintaining strict security controls over all LLM interactions.

FortiAIGate provides two primary capabilities:

- AI Flow handles intelligent AI application delivery, routing requests based on content and ensuring that traffic is processed securely and efficiently.
- AI Guard delivers comprehensive security aligned with the Open Worldwide Application Security Project (OWASP) LLM/MCP/ASI Top 10, offering protections such as prompt injection detection, data leak prevention, toxicity detection, and support for customizable security rules tailored to specific needs.

FortiAIGate includes a fully featured graphical interface that simplifies configuration and management. Administrators can easily set up AI Flow routing policies, define AI Guard security rules, and monitor real-time system activity. Detailed traffic logs and a visual dashboard provide full visibility into all AI-related requests passing through the system.

Built for modern environments, FortiAIGate runs as a containerized solution on Kubernetes, allowing the seamless deployment across public clouds, private clouds, or on-premise clusters. Its cloud-native architecture ensures scalability, portability, and operational consistency across diverse infrastructures.

secure application is used to override first application behavior as a result of routing policies and detection of security issues

(*E.g.*, https://docs.fortinet.com/document/fortiaigate/8.0.1/fortiaigate-administration-guide/784383/introduction).

22. Fortinet FortiAIGate performs a method of operating a secure application, wherein the secure application is encapsulated to prevent data sharing with a non-secure application. FortiAIGate is deployed directly "between the app and the model" as a secure proxy. On information and belief, this acts as an "LLM firewall" that manages traffic flows and applies guardrails on the model input and output. The secure application is encapsulated via a containerized deployment. Fortinet explains how FortiAIGate operates via a containerized local deployment to provide an LLM traffic steering benefit. On information and belief, when sensitive data or instructions are provided to or from an application, the FortiAIGate container intercepts the payload. The data loss prevention engine evaluates the data and actively redacts, blocks, or otherwise modifies the data and instructions from being transmitted to the external LLM. By doing so, the encapsulated wrapper is preventing secure corporate data from being shared with a non-secure, external application.




(*E.g.*, https://docs.fortinet.com/document/fortiaigate/8.0.1/fortiaigate-administration-guide/512071/fortiaigate-deployment).

SERVICE DELIVERY

## Optimize model performance

Containerized, local deployment provides a light footprint, scalability, and intelligent LLM traffic steering. FortiAIGate acts as a proxy between the app and the model, optimizing delivery. In addition, output caching offloads duplicate tasks from the model, reducing token consumption and compute costs, while improving the user experience.

(*E.g.*, https://www.fortinet.com/products/fortiaigate).




(*E.g.*, https://www.fortinet.com/products/fortiaigate).

23. **Indirect Infringement**. On information and belief, Defendant has been and now is indirectly infringing by way of inducing infringement and contributing to the infringement of claims 1 and 5 of the ‘418 Patent in the State of Texas, in this District, and elsewhere in the United States, by providing the Accused Instrumentality for use as described above by Defendant’s customers. Defendant advertised, offered for sale, and/or sold the Accused Instrumentality to its customers for use in a manner that Defendant knew infringed claims 1 and 5 of the ‘418 Patent. For example, Defendant provided marketing material advertising that the Accused Instrumentality performs the method of operating a secure application as claimed in claims 1 and 5 of the ‘418 Patent. (*Supra* ¶¶17-22 (identifying marketing materials)).

24. On information and belief, since Defendant became aware of the ‘418 patent and the infringement at least as of the date of the service of the Original Complaint, Defendant is and has been committing the act of inducing infringement by specifically intending to induce infringement by providing the Accused Instrumentality to its customers and by aiding and abetting its use as demonstrated by the marketing materials in a manner known to infringe by Defendant. Since becoming aware of the infringing use of the Accused Instrumentality, Defendant knew that the use of the Accused Instrumentality by its customers as instructed constituted direct patent infringement. Despite this knowledge, Defendant continued to encourage and induce its customers to use the Accused Instrumentality to infringe as described above and provided instructions for using the Accused Instrumentality to infringe, including through instructional materials, support, and user guides. Exemplary materials are cited above. (*Supra* ¶¶17-22 (identifying marketing materials)). Defendant therefore knowingly induced infringement and specifically intended to encourage and induce the infringement of claims 1 and 5 of the ‘418 Patent by its customers.

25. On information and belief, since Defendant became aware of the infringement of claims 1 and 5 at least as of the date of the service of the Original Complaint, Defendant is and has been committing the act of contributory infringement by intending to provide the identified Accused Instrumentality to its customers knowing that it is a material part of the invention, knowing that its use was made and adapted for infringement of claims 1 and 5 of the '418 Patent, and further knowing that the accused use of the Accused Instrumentality is not a staple article or commodity of commerce suitable for substantially non-infringing use. As described above, Defendant was aware that all material claim limitations are satisfied by the use and implementation of the Accused Instrumentality by Defendant's customers in the manner described above yet continued to provide the Accused Instrumentality to its customers knowing that it is a material part of the invention. (*Supra* ¶¶17-22 (identifying marketing materials)). As described above, since learning of the infringement, Defendant knew that the use and implementation of the Accused Instrumentality by its customers was made and adapted for infringement of the '418 Patent. (*Id.*). A new act of direct infringement occurred each time a customer implemented and/or used the Accused Instrumentality in the manner described above. After Defendant became aware that the use of the Accused Instrumentality infringes claims 1 and 5 of the '418 Patent, Defendant knew that each such new use was made and adapted for infringement of claims 1 and 5 of the '418 Patent and Defendant continued to advertise and provide the Accused Instrumentality for such infringing activities. (*Supra* ¶¶17-22 (identifying marketing materials)). Furthermore, as described more fully above, the Accused Instrumentality has functionality designed to perform the steps in the manner described above and is therefore not a staple article or commodity of commerce suitable for substantially non-infringing use. (*Id.*).

26. Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such Defendant's infringement of the '418 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

27. Unless a preliminary and permanent injunction is issued enjoining Defendant and all others acting in active concert therewith from infringing the '418 Patent, Plaintiff will be greatly and irreparably harmed.

28. Plaintiff is only asserting method claims and as such the marking requirements of 35 U.S.C. §287(a) do not apply. *Crown Packaging Technology, Inc. v. Rexam, Beverage Can Co.*, 559 F.3d 1308, 1316-1317 (Fed. Cir. 2009) ("Because Rexam asserted only the method claims of the '839 patent, the marking requirement of 35 U.S.C. §287(a) does not apply."); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1083 (Fed.Cir. 1983) ("It is settled in the case law that the notice requirement of this statute does not apply where the patent is directed to a process or method." (*quoting Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed.Cir. 1983)). Plaintiff has therefore complied with the marking requirements of 35 U.S.C. §287(a).

## V. JURY DEMAND

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claims 1 and 5 of United States Patent No. 9,135,418 have been infringed and are being infringed, either literally and/or under the doctrine of equivalents, directly and/or indirectly, by Defendant;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c. That Defendant be preliminarily and permanently enjoined from any further activity or conduct that infringes the asserted claims;

d. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

e. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

October 22, 2026

DIRECTION IP LAW

*/s/Steven G. Kalberg*
David R. Bennett (IL Bar No.: 6244214)
Steven G. Kalberg (IL Bar No.: 6336131)
P.O. Box 14184
Chicago, Illinois 60614-0184
Telephone: (312) 291-1667
dbennett@directionip.com
skalberg@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*